United States District Court
Southern District of Texas
**ENTERED**
March 31, 2016
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEITH CHESTER HILL, | § | |
| | § | |
| *Petitioner,* | § | |
| | § | |
| v. | § | Civil Action No. H-15-0818 |
| | § | |
| WILLIAM STEPHENS, | § | |
| | § | |
| *Respondent.* | § | |

## MEMORANDUM OPINION AND ORDER

Petitioner, a state inmate represented by counsel, filed this section 2254 habeas petition challenging his conviction and ninety-nine year sentence for aggravated sexual assault. Respondent filed a motion for summary judgment (Docket Entry No. 11), to which petitioner filed a response (Docket Entry No. 12).

Based on consideration of the pleadings, the motion and response, the record, and the applicable law, the Court **GRANTS** the motion for summary judgment and **DISMISSES** this case for the reasons that follow.

### I. BACKGROUND AND CLAIMS

A jury found petitioner guilty of aggravated sexual assault of a nineteen-year old man and assessed punishment at ninety-nine years' incarceration. The conviction was affirmed on appeal in an unpublished opinion, and the Texas Court of Criminal Appeals refused discretionary review. *Hill v. State*, No. 14-08-0062-CR; 2009 WL 2145833 (Tex.

App.—Houston [14th Dist.] 2009, pet. ref'd).  Petitioner's application for state habeas relief

was denied.

Petitioner raises the following two grounds for federal habeas relief:

1.      Petitioner's written confession to four extraneous offenses was improperly admitted at punishment because it was obtained in violation of his right to counsel.

2.      Trial counsel was ineffective at punishment for failing to object to extraneous offense testimony and evidence obtained from petitioner's computer.

Respondent argues that these claims are without merit and should be summarily

dismissed.

## II.  FACTUAL BACKGROUND

The intermediate state court of appeals set forth the following statement of facts in its

decision affirming petitioner's conviction:

> Baytown Detective J.R. Miller questioned appellant, who was nineteen years old at the time, following his arrest for the aggravated sexual assault of the complainant, an adult male.   After appellant was read his rights and acknowledged understanding them, the following exchange occurred:
>
> [Det. Miller]:       Okay. This bottom part is just a waiver of your rights and it says "I have read this statement of my rights. I understand what my rights are. I'm willing to make a statement and answer questions. I wish to waive any of those rights and I understand and know what I am doing." Okay. And what that is about is I would like to visit with you for awhile and ask you some questions, doesn't mean that you can't terminate the interview still, but just means that for the time being you're willing to visit with me. Okay?
>
> [Appellant]:  I was told not to answer any questions.

2

[Det. Miller]:            Who told you that?

[Appellant]:   I ain't gonna say who told me that, but I was told just "Get a lawyer."

[Det. Miller]:            Do what?

[Appellant]:   "Get a lawyer."

[Det. Miller]:            Okay. Well that is entirely up to you. You're a grown man in the eyes of the State of Texas. I'd like to visit with you obviously about what's going on and . . . get your feelings and thoughts about where we're at with this and *et cetera*.  But you're a grown man, so we can start for a while and you can choose to discontinue at any time.

[Appellant]:   Can I get one?

[Det. Miller]:            Do what?

[Appellant]:   Can I get one?

[Det. Miller]:            Can you get one?

[Appellant]:   A lawyer.

[Det. Miller]:            Certainly. That's absolutely [your] right. I can't prevent you from doing that. Are you saying that you would not like to visit with me about what's going on and . . .

[Appellant]:   Oh, well.

[Det. Miller]:            *et cetera*

[Appellant]:   I was told not to say nothing so, you know.

[Det. Miller]: Somebody told you not to say nothing – say anything?

[Appellant]: Mmm-hmm. "Get a lawyer [unintelligible]."

[Det. Miller]:            Well, again, you're a grown man. That's a decision you

3

need to make for yourself, not somebody else make it for you.

[Appellant]:  Okay.  I'll get one.

[Det. Miller]:      You'll do what?

[Appellant]:  I'll get one.

[Det. Miller]:      Get one?

[Appellant]:  A lawyer.

Detective Miller continued questioning appellant.  Appellant responded to Detective Miller's continued questioning and eventually waived his rights, but denied the allegations after several hours of questioning.  Later that day, appellant was taken before a magistrate who warned appellant of his rights and noted that appellant requested the appointment of counsel at that time.

Authorities transferred appellant from Baytown to the downtown Harris County Jail, where he was taken to inmate processing.  On February 8th, Detective Shane McCoy had appellant removed from inmate processing and placed in an office.  Detective McCoy re-administered appellant's rights.  Appellant waived his rights and eventually gave a detailed written confession to the aggravated sexual assault of four men (Q.C., Cr. B., J.O., and the complainant), and the attempted aggravated sexual assault of a fifth man (Ca. B.).

At the suppression hearing, Detective McCoy admitted initiating contact with appellant and stated that to his knowledge appellant had never requested to speak to law enforcement officers.  The trial court viewed the recording of Detective Miller's questioning, heard the testimony of Detective Miller and Detective McCoy, and denied appellant's motion to suppress, finding that appellant never unambiguously invoked his right to counsel.

At the guilt/innocence phase of trial, a redacted confession was admitted, which related appellant's assault on the complainant.  Also, the complainant described the assault before the jury.  He testified that one evening a dark-skinned male abducted him at gunpoint from his driveway, asked where he kept his wallet, put him face down on the ground, bound his hands with zip

4

ties, placed duct-tape over his eyes, put him in an SUV, and began driving. The assailant eventually stopped, told the complainant he would make him pay for not having any money, and sexually assaulted him at gunpoint. The complainant testified that his shirt was probably stained with the assailant's semen during this incident, and the State presented evidence that semen stains on the complainant's shirt matched appellant's DNA profile. After sexually assaulting the complainant, the assailant beat him with the butt of his pistol, drove to another location, released the complainant, and fled. The jury convicted appellant of the aggravated sexual assault of the complainant.

At the punishment phase, the redacted portions of appellant's confession regarding the incidents involving Q.C., Cr. B., J.O., and Ca. B. were read before the jury. Detective Miller testified that the incidents occurred over ten months and that all of the victims gave similar suspect descriptions. He further testified that similar demands were made in each incident and that the cases involving Q.C., the complainant, Cr. B., and J.O. were similar in several respects, leading Detective Miller to believe they were committed by the same person. Detective McCoy testified that the *modus operandi* in the incidents involving Q.C. and Ca. B. mirrored all of the other cases. A class ring taken during Q.C.'s assault and a newspaper clipping regarding the offenses were found in appellant's home. Analysis of appellant's computer showed that all five victims' names and addresses were on the hard drive; all of their addresses had been used in internet searches, and several of their Myspace pages had been visited, even though the police never released any of the victims' information. The jury also heard the testimony of Q.C., Cr. B., and J.O. describing their respective assaults, and Detective McCoy testified regarding the assault on Ca. B. and his subsequent identification of appellant as his assailant.

Q.C. testified that a masked man with a pistol approached him at the end of Q.C.'s driveway, pushed him to the ground, tied his hands with zip ties, and forced him into Q.C.'s truck. The assailant drove the truck to a field and duct-taped Q.C.'s eyes. He then took Q.C.'s wallet and removed money from Q.C.'s bank account after demanding his PIN at gunpoint. While driving, the assailant sexually assaulted Q.C. and beat him with a pistol. The assailant then stopped in a field. He pulled Q.C. out of the truck and threatened to shoot or kill him if he tried to escape. He then walked Q.C. (who was naked from the waist down at that point) around the field, threw him down next to the truck, and sexually assaulted him for ten to fifteen minutes. He took naked pictures of Q.C. and threatened to post them on Myspace if Q.C. said anything. The

assailant left Q.C. sitting in thorn bushes in a drainage ditch and fled with Q.C.'s class ring, among other items.  Authorities later found the ring at appellant's residence.

Cr. B. testified that he answered the door one morning to find a black male with his face covered threatening him with a gun.  The assailant entered Cr. B.'s home, told him to lie face down, bound him with zip ties, duct-taped his eyes and face, and took his money.  Cr. B. freed one of his hands and attempted to escape, but his assailant put him in a "choke hold," threw his head against the door multiple times, and retied his hands.  The assailant then attempted to sexually assault him.  When Cr. B. resisted, the assailant beat him and placed duct tape over his mouth and nose, causing him to pass out.  The assailant told him to wake up, kicked him in the head, poked him in the stomach with a knife, and threatened to stab him.  The assailant left Cr. B. with a knife to cut himself free and fled.  Cr. B. could not identify his assailant. Detective Miller testified that a composite sketch based on Cr. B.'s description of the assailant was not "particularly close" in appearance to a previous sketch of the assailant from one of the other incidents and was not released for fear that it would confuse the public.  Appellant was excluded as a contributor to DNA evidence obtained by swabbing duct tape from Cr. B.'s assault, though an unknown third person's DNA was found.  However, analysis of appellant's computer showed that it had been used to visit Cr. B.'s Myspace page, and that Cr. B.'s last name and home address had been used to conduct white pages and Map Quest searches on the internet.

J.O. testified that he returned to his bedroom from the bathroom one night to find a black male with a gun in his room.  The assailant put the gun to the back of J.O.'s head, told him to lie on the bed, covered J.O.'s face, and asked him if he had any money.  He then walked J.O. to the woods at knifepoint.  In the woods, the assailant told J.O. to lie face down on the ground and attempted to sexually assault him.  When J.O. resisted, the assailant picked him up and slammed his head into a tree multiple times, knocking him down.  The assailant walked J.O. farther into the woods and attempted to sexually assault him again, but fled when J.O. escaped.  At a later date, J.O. saw appellant at a stoplight and thought he was his assailant.  J.O. followed appellant's car after appellant acted suspiciously, covered up his face, and sped away when he saw J.O.  J.O. failed to identify appellant as his assailant from a photo array, despite recognizing him as someone from school.  However, on cross examination by the defense, J.O. testified as follows:

[Defense Counsel]:   [Y]ou say you had a glance [at your assailant] in the dark?

[J.O.]:          Yes.

[Defense Counsel]:   That person wasn't Keith Hill?

[J.O.]:          Oh, I don't know.  I'm thinking it was.

[Defense Counsel]:   But you're not sure?

[J.O.]:          I'm not for sure, not a hundred percent.  But if I had to say "yes" or "no," I'd say "yes."

Though Ca. B. did not testify at punishment, Detective McCoy (who handled Ca. B.'s case) testified that the *modus operandi* in his case was similar to Q.C.'s case in many respects, including the description of the assailant, and the use of a pistol and zip ties. Detective McCoy also testified that Ca. B. identified appellant as his assailant from a photo lineup.  Further, the evidence showed that appellant's computer was used to access Ca. B.'s Myspace page and conduct a map search on the internet using his address.

The jury sentenced appellant to ninety-nine years' imprisonment.

*Hill*, at *1–4 (footnote omitted).

## III.  THE APPLICABLE LEGAL STANDARDS

A.    <u>Habeas Review</u>

This petition is governed by the applicable provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).  28 U .S.C. § 2254.  Under the AEDPA, federal habeas relief cannot be granted on legal issues adjudicated on the merits in state court unless the state adjudication was contrary to clearly established federal law as determined by the Supreme Court, or involved an unreasonable application of clearly established federal law as determined by the Supreme Court.  *Harrington v. Richter*, 562 U.S. 86, 98–99 (2011);

7

*Williams v. Taylor*, 529 U.S. 362, 404–05 (2000); 28 U.S.C. §§ 2254(d)(1), (2). A state court decision is contrary to federal precedent if it applies a rule that contradicts the governing law set forth by the Supreme Court, or if it confronts a set of facts that are materially indistinguishable from such a decision and arrives at a result different from the Supreme Court's precedent. *Early v. Packer*, 537 U.S. 3, 7–8 (2002).

A state court unreasonably applies Supreme Court precedent if it unreasonably applies the correct legal rule to the facts of a particular case, or unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply, or unreasonably refuses to extend that principle to a new context where it should apply. *Williams*, 529 U.S. at 409. In deciding whether a state court's application was unreasonable, this Court considers whether the application was objectively unreasonable. *Id.* at 411. "It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Richter*, 562 U.S. at 102. As stated by the Supreme Court in *Richter*,

> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings. It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no farther. Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal.

*Id.*, at 102–03 (emphasis added; internal citations omitted).

8

The AEDPA affords deference to a state court's resolution of factual issues. Under 28 U.S.C. § 2254(d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller–El v. Cockrell*, 537 U.S. 322, 343 (2003). A federal habeas court must presume the underlying factual determination of the state court to be correct, unless the petitioner rebuts the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Miller–El*, 537 U.S. at 330–31.

B.    Summary Judgment

In deciding a motion for summary judgment, the district court must determine whether the pleadings, discovery materials, and the summary judgment evidence show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Once the movant presents a properly supported motion for summary judgment, the burden shifts to the nonmovant to show with significant probative evidence the existence of a genuine issue of material fact. *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

While summary judgment rules apply with equal force in a section 2254 proceeding, the rules only apply to the extent that they do not conflict with the federal rules governing habeas proceedings. Therefore, section 2254(e)(1), which mandates that a state court's findings are to be presumed correct, overrides the summary judgment rule that all disputed

9

facts must be construed in the light most favorable to the nonmovant.  Accordingly, unless a petitioner can rebut the presumption of correctness of a state court's factual findings by clear and convincing evidence, the state court's findings must be accepted as correct by the federal habeas court.  *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

## IV.  EXTRANEOUS OFFENSE CONFESSION

Petitioner claims that the state court unreasonably denied his claim that his confession to the commission of four extraneous offenses was improperly admitted at punishment. He asserts that the confession was obtained in violation of his Fifth Amendment right to counsel and caused him harm.

The state court of appeals agreed with petitioner that the confession was improperly admitted at the punishment hearing, but found the error harmless, as follows:

> In his first issue, appellant argues the trial court's admission of his written confession violated his right to counsel under the Fifth Amendment because he invoked that right during his interrogation by Detective Miller.  Appellant requests a new trial on punishment only and acknowledges that any error in the admission of his redacted confession at guilt/innocence was probably harmless given the complainant's testimony and the State's DNA evidence.  We therefore limit our analysis to whether the trial court erred by admitting appellant's full confession at punishment.
>
> When reviewing a trial court's ruling on a motion to suppress, we afford almost total deference to determinations of historical facts, especially when those determinations involve assessment of witness credibility and demeanor. We accord the same deference to determinations of mixed questions of law and fact if their resolution depends upon witness credibility and demeanor. However, when, as here, we have a videotape of the confession and an

10

uncontroverted version of events, we review the trial court's ruling on an application of law to facts *de novo*.

The police must advise a suspect whom they have arrested of the right to have counsel present during any police-initiated interrogation.   Unlike the right to counsel under the Sixth Amendment, which attaches automatically, the Fifth Amendment right to counsel will attach only when affirmatively invoked by the accused.   However, such an invocation must be clear, unambiguous, and unequivocal.   Whether the mention of a lawyer constitutes a clear invocation of the right to counsel will depend upon the statement itself and the totality of the surrounding circumstances.   The test is an objective one: the suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney."

 Once the suspect has invoked the Fifth Amendment right to counsel, police interrogation must cease until counsel has been provided or the suspect himself reinitiates further communication, exchanges, or conversations with police. The impetus for reinitiation must come from the suspect, not from police interrogation or conduct that is the functional equivalent of interrogation. "Once a suspect has clearly invoked his right to counsel, no subsequent exchange with the police (unless initiated by the suspect) can serve to undermine the clarity of the invocation." Further, one officer's knowledge that a defendant has requested counsel is imputed to every other State agent.

Here, after appellant acknowledged understanding his rights, Detective Miller told him he would like to question him about the allegations, to which appellant responded that he was told not to say anything and to get a lawyer. Detective Miller told appellant that appellant could make that decision, but said that they could talk for awhile and stop when appellant so chose. Appellant responded, "Can I get [a lawyer]?" Detective Miller told appellant that getting a lawyer was his right.  He then asked if appellant was saying that he did not want to talk with him.  Appellant responded that he was told not to say anything and to get a lawyer.  Detective Miller told appellant that was a decision he needed to make for himself.  Appellant responded by stating "Okay, I'll get [a lawyer]."  Based on appellant's statements and the totality of the circumstances, we believe that appellant articulated his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.

11

When appellant stated "Okay, I'll get [a lawyer]" after Detective Miller put him to a decision on that issue, all questioning should have immediately ceased until counsel was provided or appellant reinitiated the conversation. Instead, Detective Miller asked if appellant was saying that he did not wish to talk. Although appellant eventually stated that he wanted to talk and waived his rights and confessed, he did not reinitiate contact with police. Where, as here, the authorities followed a suspect's clear invocation of the right to counsel by asking if the suspect does not wish to speak with authorities, a defendant's response that he does wish to talk may not be used to cast retrospective doubt on the clarity of the initial request itself. The fact that appellant confessed only after Detective McCoy reapproached him, reread his rights, and secured a waiver of those rights is immaterial because Detective McCoy reinitiated contact and was charged as a State agent with knowledge of appellant's prior invocation. We therefore hold that the trial court erred in admitting appellant's confession, which was taken in violation of his Fifth Amendment right to counsel.

Having determined an error of constitutional magnitude occurred, we must reverse the judgment unless we determine the error was harmless as to punishment beyond a reasonable doubt. In determining whether constitutional error in the admission of evidence is harmless, we consider several factors, including: the importance of the evidence to the State's case; whether the evidence was cumulative of other evidence; the presence or absence of other evidence corroborating or contradicting the evidence on material points; the overall strength of the State's case; the content of the erroneously admitted statement; and any other factor, as revealed by the record, that may shed light on the probable impact of the error on the mind of the average juror. Other cases indicate we may consider additional factors such as the source and nature of the error, the emphasis placed upon the evidence by the State, the probable collateral implications of the error, the weight a juror may have placed on the evidence, and whether finding the error harmless would encourage the State to repeat the conduct. "Reversal is required unless we can determine, beyond a reasonable doubt, that the failure to suppress the [erroneously admitted] statement did not contribute to the jury's verdict at the sentencing phase." A constitutional error does not contribute to the punishment if the jury's verdict would have been the same even if the erroneous evidence had not been admitted. However, the fact that the State offered the full confession only at punishment affects our analysis because at sentencing the issue is not whether appellant did or did not commit the extraneous offenses, but rather the appropriate punishment to be assessed.

12

Although a defendant's confession is generally likely to have a profound impact on the jury, especially at the guilt stage of the trial, the circumstances of a particular case may render the erroneous admission of such evidence at sentencing harmless.  For instance, an erroneously admitted confession may play an insignificant role in the State's case where the jury is presented with substantial other evidence linking a defendant to the confessed offenses. Here, substantial other evidence was presented linking appellant to the extraneous offenses. At appellant's home authorities found Q.C.'s class ring, linking him to Q.C.'s assault, along with a newspaper clipping regarding the offenses.  The State presented independent evidence of the remarkably similar *modus operandi*, assailant descriptions, and details of each offense, evidence which rendered the bulk of appellant's confession cumulative.   Although the confession contains details not reported by other sources regarding appellant's planning of and preparation for the offenses, the jury could easily infer that the offenses were calculated and predatory based on the State's witnesses' offense descriptions and the evidence found on appellant's computer.  The State also linked appellant to the offenses and demonstrated his predatory nature through the testimony of an F.B.I. computer analyst regarding the contents of appellant's computer: all five victims' names and addresses were found on the computer's hard drive even though, according to Detective Miller, that information was not released to the public; four of the victims' addresses were used in searches on map sites, while the other victim's address was used for a search on "New Home Source.com"; at some point, a ".jpg" picture file identifying Q.C.'s genitalia was on the computer; and the MySpace pages of Ca. B., Cr. B., and possibly J.O. had been visited from appellant's computer. Finally, Ca. B. and J.O. identified appellant as their assailant.  We note that Cr. B. and J.O. testified that their assailant only attempted to sexually assault them, contradicting appellant's confession to actually sexually assaulting them. However, we believe beyond a reasonable doubt that this discrepancy had no effect on the jury's punishment assessment given the undisputed evidence illustrating the brutality and violence of the attacks on Cr. B. and J.O.  Given the strength of the State's case absent the confession and the substantial other evidence linking appellant to the extraneous offenses, the confession was largely cumulative and thus was relatively unimportant to the State's case.

Next, we examine the confession's content and any collateral implications stemming from the confession's admission.  In *Jones v. State*, the Court of Criminal Appeals held harmless the erroneous admission at punishment of a

defendant's confession to two extraneous offenses, noting that the confession was replete with self-serving, mitigating statements and that there were no detrimental collateral implications stemming from the taking or admission of the confession. Though appellant's confession contains his admission to committing the extraneous offenses, it also contains several mitigating statements. For instance, appellant stated that a white male intruder molested him as a child. He then stated that he "recently met a girl" who had a similar experience, and claimed that her story led him to realize that he "needed to better deal with" his childhood molestation and "needed to stop taking the 'dignity' away from the white males who [he] had been after." Appellant also expressed "deep regrets" over the offenses and stated his belief that the offenses occurred because of his mental issues, for which he expressed a desire to be treated. Finally, appellant stated that he is "very sorry" for his actions and asked for his victims' forgiveness. We believe these mitigating statements negated any harmful impact that the error might have otherwise had on the jury's punishment assessment. The lack of negative collateral implications stemming from the confession's admission is further demonstrated by the fact that appellant did not dispute his commission of the extraneous offenses at the punishment phase (or on appeal), but rather sought leniency from the jury and argued that the offenses were out of character.

The State placed little emphasis on the erroneously admitted confession. The State mentioned appellant's confession at the beginning of its final closing argument, but did so in the context of explaining to the jury when they could consider extraneous offenses at punishment. In giving that explanation, the State also pointed to (1) other evidence implicating appellant and (2) the closing argument of defense counsel to assert, without objection, that appellant was not contesting his commission of the extraneous offenses. At one point in closing arguments, the State even made an apparent attempt to discredit portions of the confession by implying that differences between it and some of the victims' accounts resulted from fabrications by appellant. Although the State argued: "[Appellant] has the gall to mention God in his confession. There's only one God in [appellant's] world, and that's [appellant]. Control, power, that's what it's about," this reference to the confession was very brief and was apparently meant to impugn appellant's character, rather than being an attempt to emphasize the confession itself. Finally, we see no potential harm in the State's argument that appellant should not get credit for confessing when the physical evidence against him was limited by his victims' resistance,

as that reference to appellant's confession was made in response to the defense's closing argument.

While holding the erroneous admission of appellant's confession harmless could encourage the State to repeat the conduct, that factor does not effect our decision here given our analysis of the other factors above. We are concerned when, as here, the police disregard a suspect's invocation of the right to counsel, and we emphasize that the erroneous admission of a resulting confession will result in the reversal of a conviction unless it is proven harmless beyond a reasonable doubt. However, having reviewed the evidence in light of the appropriate factors, we are convinced beyond a reasonable doubt that under the circumstances of this particular case the jury's punishment assessment would have been the same even if appellant's confession had not been admitted. We therefore hold the erroneous admission of appellant's confession harmless, and overrule his first issue.

*Hill*, at *4–8 (citations, footnote omitted). Thus, the state court determined that the confession was inadmissible at punishment as it was obtained in violation of petitioner's Fifth Amendment right to counsel, but ultimately held the error harmless. Petitioner argues that the error was not harmless because, had the confession been suppressed, at least three of the extraneous offenses would not have been admissible as the jury could not have concluded beyond a reasonable doubt that petitioner committed them.[1]

---

[1]The parties disagree as to whether the United States Supreme Court has yet to clearly establish that the Fifth Amendment right to counsel applies in context of evidence presented at a non-capital punishment hearing. The intermediate state court of appeals expressly relied on *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981), for its ruling that, "[o]nce the suspect has invoked the Fifth Amendment right to counsel, police interrogation must cease until counsel has been provided or the suspect himself reinitiates further communication, exchanges, or conversations with police." *Hill*, at *5. The applicability of *Edwards* in context of extraneous offense evidence during the punishment phase of trial was not before the state court in *Hill*. Nor was it at issue in *Edwards* or in any subsequent Supreme Court case cited by the parties. Both sides have, by necessity, fashioned their respective arguments by cobbling together Supreme Court rulings, dicta, and in the case of petitioner, observations

The AEDPA review to be undertaken by this Court is whether the state court correctly determined that petitioner was not harmed by the extraneous offense evidence improperly admitted during punishment. The proper standard of review for federal harm analysis is set forth in *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993), which asks whether the improper evidence had a "substantial and injurious effect or influence in determining the jury's verdict." *See Robertson v. Cain*, 324 F.3d 297, 306–07 (5th Cir. 2003) (holding that *Brecht* applies post-AEDPA enactment and is applicable even if the state court failed to perform a harmless error analysis). Under the *Brecht* standard, a petitioner should prevail whenever the record is "so evenly balanced that a conscientious judge is in grave doubt as to the harmlessness of the error." *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995).

In determining that petitioner had not been harmed, the state court found that, "[H]aving reviewed the evidence in light of the appropriate factors, we are convinced beyond a reasonable doubt that under the circumstances of this particular case the jury's punishment assessment would have been the same even if appellant's confession had not been admitted. We therefore hold the erroneous admission of appellant's confession harmless[.]" *Hill*, at

---

published by Professor Wayne R. LaFave. In short, the parties have not cited any applicable Supreme Court precedent directly on point, and neither party has shown that the state court's determination regarding the inadmissibility of the complained-of evidence during punishment was, or was not, "contrary to clearly established federal law as determined by the Supreme Court," or did, or did not, "involve[] an unreasonable application of clearly established federal law as determined by the Supreme Court." *Richter*, 562 U.S. at 98–99. This specific issue was not presented to the state court, and will not be addressed at this juncture.

*8.[2]  It is this determination of harmlessness that the Court must here review under the

AEDPA standards, applying *Brecht* as the metric.  *See Fry v. Pliler*, 551 U.S. 112, 121–22

(2007) ("We hold that in § 2254 proceedings a court must assess the prejudicial impact of

constitutional error in a state-court criminal trial under the 'substantial and injurious effect'

standard set forth in *Brecht, supra*, whether or not the state appellate court recognized the

error and reviewed it for harmlessness under the 'harmless beyond a reasonable doubt'

standard set forth in *Chapman*[.]").

This Court has carefully reviewed the evidence presented at the punishment hearing

and finds that the erroneous admission of petitioner's confession to the four extraneous

offense incidents did not have a substantial effect or influence in determining the verdict at

punishment.  Of the four extraneous sexual assault and robbery offenses mentioned in

petitioner's confession, three of the victims testified live at the punishment hearing.  Victim

J.O testified that his assailant broke into his bedroom, used a shirt to blindfold him, and took

him out into the backwoods at gunpoint and knifepoint.  The assailant ordered J.O. to

perform certain sexual acts on him, and slammed J.O.'s head into a tree when J.O. tried to

---

[2]The state intermediate appellate court made no mention of *Chapman v. California*, 386 U.S. 18 (1967) in reaching its decision.  The state court expressly relied on Rule 44.2 of the Texas Rules of Appellate Procedure, which provides that, "[T]he court of appeals must reverse a judgment of conviction or punishment unless the court determines beyond a reasonable doubt that the [constitutional] error did not contribute to the conviction or punishment."  That the *Chapman* standard may be similar to, or the same as, that of Rule 44.2 is of no moment here.  *See Fry v. Pliler*, 551 U.S. 112, 121–22 (2007).

escape.  J.O. managed to break free and called the police.  A week later, J.O. saw his assailant driving in town, alerted the police, and followed him.  Petitioner was arrested, and J.O. identified him by a photograph.  Although J.O. was unable to state that he was "100% sure" petitioner was his attacker, he testified that, as between "yes" or "no," he would state that "yes," petitioner was his attacker.

A second victim, Q.C., testified at the punishment hearing that he had been attacked at his home by a male wearing a ski mask and pointing a gun.  The assailant zip tied Q.C.'s hands, duct taped his eyes, and drove him around in his truck.  He forced Q.C. to withdraw money from an ATM, then demanded that Q.C. perform sexual acts on him.  Q.C. complied, but his assailant pistol-whipped him in the head twice.  The assailant drove him to a field where he forced Q.C. to the ground and sexually assaulted him for ten to fifteen minutes.  The attacked took Q.C.'s necklace and rings, including a class ring, and abandoned Q.C. in a ditch.  FBI agents testified that, during a subsequent search of petitioner's home, they found Q.C.'s rings in petitioner's bedroom nightstand, and a copy of a Houston Chronicle article entitled, "Serial Attacker of Young Men Sought," in a space above a kitchen cabinet.

A third victim, Cr. B., testified that he answered a knock at his door and found a man pointing a gun.  The man threatened to shoot Cr. B. if he did not let him into the house.  The man forced Cr. B. to the floor, zip tied his hands, and duct taped his eyes.  He then checked Cr. B.'s pockets and house for money, and ordered Cr. B. to perform certain sexual acts on him. Although Cr. B. was unable to identify his assailant, an artist's rendering was done

18

based on Cr. B.'s descriptions of the man, and the rendering was admitted into evidence for the jury's consideration.

Forensic evidence obtained from petitioner's computer was also introduced into evidence at the punishment hearing. Analysis of the computer and hard drive located searches for the names and addresses of complainant, Q.C., Cr. B., Ca. B., and J.O; the names of the individual victims had not been released to the public. Forensic analysis of petitioner's computer also revealed that the computer had been used to access Myspace accounts for Ca. B., Cr. B., and J.O., and that there was a "jpg" file, which was a picture file, entitled "[Q.C.]sdick.jpg." (Docket Entry No. 5-6, p. 61). These and similar facts regarding data obtained from petitioner's computer were set forth in the state appellate court's decision.

As stated by the intermediate state court of appeals, "[t]he State presented independent evidence of the remarkably similar modus operandi, assailant descriptions, and details of each offense." *Hill*, at *6. The state court concluded that, "[g]iven the strength of the State's case absent the confession[,] and the substantial other evidence linking applicant to the extraneous offenses, [petitioner's] confession was largely cumulative." *Id*. The state court also noted that, although petitioner's confession contained his admissions that he committed the extraneous offenses, it also contained several mitigating statements. *Id*. at *7. Petitioner expressed "deep regret" for his actions and said that he was "very sorry," and asked for his victims' forgiveness. *Id*. He also stated he had been molested as a child and that he believed the offenses were the result of a mental illness, for which he wanted to get treatment. *Id*.

19

The state court found that these mitigating statements "negated any harmful impact that the error might have otherwise had on the jury's verdict." *Id.* Petitioner's uncle, aunt, father, and a neighbor also testified at punishment as to petitioner's good qualities. Although the State had argued for a life sentence, the jury assessed punishment at 99 years.

While this Court does not necessarily agree that the confession's mitigating elements wholly negated *any* impact of petitioner's admissions to the extraneous offenses, it does find that the state court's determination of harmlessness was not objectively unreasonable under *Brecht* and in light of the other evidence presented in the state court proceeding. The computer data, the detailed testimony provided by the three other victims recounting their horrendous experiences, the stolen rings and newspaper article uncovered at petitioner's home, the factual similarity among the offenses, the actual identifications of petitioner by two victims as their attacker, descriptions of he attacker provided by the other victims, as well as the complainant's own testimony during guilt-innocence as to his sexual assault and robbery at the hands of petitioner, were of such force and significance that they warranted the jury's verdict. The written confession undoubtedly had an impact on the jury, but this Court cannot find that it had a *substantial* effect or influence in determining the jury's punishment assessment, and the record is not "so evenly balanced that a conscientious judge [would be] in grave doubt as to the harmlessness of the error." *O'Neal*, 513 U.S. at 437.

Petitioner argues that the state appellate court's determination of harmlessness was tainted by its reliance on evidence that, had counsel objected at trial, would have been

excluded. Specifically, petitioner complains that the computer data and hearsay testimony regarding the sexual assault of Ca. B. were presented to the jury, even though the state habeas court found the evidence inadmissible for purposes of petitioner's ineffective assistance of counsel claims. Petitioner's argument ignores the crucial distinction between evidence held inadmissible as trial error and evidence that could have been excluded had counsel objected. Because trial counsel did not object to this other evidence at trial, its admissibility could not be challenged on direct appeal or state collateral review. *See, e.g., Corwin v. Johnson*, 150 F.3d 467, 473 (5th Cir. 1998) (noting that the Texas contemporaneous objection rule for preservation of error is strictly and regularly applied). Consequently, the evidence was properly before the intermediate state court of appeals for purposes of its harm analysis regarding petitioner's confession. The evidence is also properly before this Court as part of the state court record for the Court's *Brecht* analysis. That counsel was found deficient in failing to object does not supplant counsel's actual failure to object for purposes of a *Brecht* analysis.[3]

The state court on collateral review denied as harmless error petitioner's claim regarding the erroneous admission of petitioner's confession during punishment. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, clearly established federal law or was an unreasonable determination of the

---

[3]Counsel's failure is, however, central to the *Strickland* analysis of actual prejudice in petitioner's ineffective assistance of counsel claim, *infra*.

facts based on the evidence in the record.  This Court finds that petitioner falls short of establishing that the improperly-admitted punishment evidence had a substantial effect or influence in determining the jury's punishment assessment.  Respondent is entitled to summary judgment dismissal of this claim.

## V.   INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

The Sixth Amendment to the United States Constitution guarantees a criminal defendant the right to the effective assistance of counsel. U.S. CONST. amend. VI.  A federal habeas corpus petitioner's claim that he was denied effective assistance of counsel is measured by the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984).  To assert a successful ineffectiveness claim, a petitioner must establish both constitutionally deficient performance by counsel and actual prejudice as a result of counsel's deficient performance. *Id.* at 687.  The failure to demonstrate either deficient performance or actual prejudice is fatal to an ineffective assistance claim. *Green v. Johnson*, 160 F.3d 1029, 1035 (5th Cir. 1998).

A counsel's performance is deficient if it falls below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688.  In determining whether counsel's performance was deficient, judicial scrutiny must be highly deferential, with a strong presumption in favor of finding that trial counsel rendered adequate assistance and that the challenged conduct was the product of a reasoned trial strategy. *West v. Johnson*, 92 F.3d 1385, 1400 (5th Cir. 1996).  To overcome this presumption, a petitioner must identify the acts or omissions of counsel

that are alleged not to have been the result of reasonable professional judgment. *Wilkerson v. Collins*, 950 F.2d 1054, 1065 (5th Cir. 1992). However, a mere error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment. *Strickland*, 466 U.S. at 691.

Actual prejudice from a deficiency is shown if there is a reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different. *Id.* at 694. To determine prejudice, the question focuses on whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair. *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). In that regard, unreliability or unfairness does not result if the ineffectiveness does not deprive the petitioner of any substantive or procedural right to which he is entitled. *Id.*

In context of ineffective assistance during the punishment phase of a state trial, the relevant inquiry is whether, absent counsel's errors, there is a reasonable probability that the defendant's sentence would have been "significantly less harsh," *Spriggs v. Collins*, 993 F.2d 85, 88–89 (5th Cir.1993), taking into account "such factors as the defendant's actual sentence, the potential minimum and maximum sentences that could have been received, the placement of the actual sentence within the range of potential sentences, and any relevant

mitigating or aggravating circumstances." *Id.* at 88. *See also Dale v. Quarterman*, 553 F.3d 876, 880 (5th Cir. 2008).[4]

Petitioner alleges that trial counsel was ineffective in failing to object to inadmissible evidence at the punishment hearing. Specifically, he claims that counsel should have objected to the hearsay testimony regarding Ca. B.'s attack and the data obtained from his computer. In rejecting these claims, the state habeas court made the following relevant supplemental findings of fact and conclusions of law:

> 7.    The Court finds that [trial counsel's] performance fell below an objective standard of reasonableness when he failed to object to the admission of [Ca. B.'s] hearsay statement. The court finds that [Ca. B.] was one of 5 young men who were brutally abducted and assaulted in a unique and aggressive manner. The Court finds that even though the jury should not have heard [Ca. B.'s] hearsay statement, they properly heard the testimony of [complainant, J.O., Q.C., and Cr. B.]. The Court finds that the State's argument for the maximum punishment was based on a plea for law enforcement to protect the community from Applicant. The State argued Applicant was a predator and a calculating abductor and rapist who collected trophies from his victims.
>
> The Court finds that based on the totality of evidence submitted to the jury and the State's argument, even if counsel had performed adequately as to the testimony of [Ca. B.], the result would not have been different.

(Docket Entry No. 5-3, pp. 6–7.) The Texas Court of Criminal Appeals relied on these findings of fact and conclusions of law in denying habeas relief. *Id.*, at cover.

---

[4]The *Spriggs* "significantly less harsh" standard applies here because the alleged ineffective assistance arose during a state sentencing hearing, not a federal one. *See United States v. Grammas*, 376 F.3d 433, 438 & n. 4 (5th Cir. 2004) (holding that *Spriggs* does not apply to federal sentencing).

The state habeas court also made the following supplemental findings of fact and conclusions of law in rejecting petitioner's ineffective assistance claim regarding the computer hard drive evidence:

3.     The court finds that, even though the evidence seized from the computer should not have been admitted before the jury, the jury had very compelling circumstantial evidence that Applicant committed the aggravated sexual assault of [Q.C.] without the computer evidence. [Q.C.] described a sexual assault which mirrored the details of [complainant's] assault. The assaults occurred in the same area and in a close time frame. Although [Q.C.] could not identify his assailant, [his] ring was found in Applicant's home and [Q.C.] was later found to be a student in the same high school class as Applicant. Looking at the totality of the circumstantial evidence, the court finds that the jury could have reasonably believed beyond a reasonable doubt that applicant committed the aggravated sexual assault of [Q.C.] even without the computer evidence.

4.     The court finds that, even though the evidence seized from the computer should not have been admitted before the jury, the jury had very compelling circumstantial evidence that Applicant committed the aggravated sexual assault of [J.O.] without the computer evidence. The court finds that [J.O.] described a sexual assault and abduction with details that mirrored the facts of the [complainant's, Q.C.'s, and Cr. B's] cases. Although [J.O.] was unable to positively identify his assailant, he later saw a person whom he believed to be his assailant driving a Jeep.   [J.O.] felt so strongly about the person driving the Jeep, that he followed him to a police station, got a partial license plate from the Jeep and learned that the Jeep was registered to Phillip Hill, the applicant's father. The driver of the Jeep was later determined to be Applicant. [J.O.] also gave a tentative identification of the Applicant and provided a description to a sketch artist that matched the description of the Applicant. [J.O.] was also found to be a former high school classmate of the Applicant's.   Looking at the totality of the circumstantial evidence, the court finds that the jury could have reasonably believed beyond a reasonable doubt that applicant

25

committed the aggravated sexual assault of [J.O.] even without the computer evidence.

5.   The Court finds that, even though the evidence seized from the computer should not have been admitted before the jury, the jury had very compelling circumstantial evidence that Applicant committed the aggravated sexual assault of [Cr. B.]. [Cr. B.] testified in the punishment phase to details of his sexual assault which mirrored the other sexual assaults of [complainant, J.O., and Q.C.]. The Baytown location, the close proximity in time, the implements used in the crime and the unique type of assault all mirrored the assaults of other complainants. The jury also learned that [Cr. B.] was a former high school classmate of Applicant. Although [Cr. B.] could not provide a positive identification of the defendant, he did provide a general description to a police artist, who produced a sketch of his assailant. This sketch was submitted to the jury. Looking at the totality of the circumstantial evidence, the court finds that the jury could have reasonably believed beyond a reasonable doubt that applicant committed the aggravated sexual assault of [Cr. B.], even without the computer evidence seized from the residence of Applicant.

6.   The Court finds that [trial counsel's] performance fell below an objective standard of reasonableness by failing to object to the admission of evidence found on Applicant's computer; however, based on the other compelling circumstantial evidence heard by the jury, the Court finds that, if counsel had performed adequately, the result would not have been different.

*Id.*, pp. 4–7. The Texas Court of Criminal Appeals relied on these findings of fact and conclusions of law in denying habeas relief. *Id.*, at cover.

In addressing petitioner's *Strickland* claim, the state habeas court agreed with petitioner that counsel was deficient in failing to object to [Ca. B.'s] hearsay testimony and the hard drive evidence, but it determined that, even had counsel performed adequately, the result at punishment would not have been different. Thus, the state habeas court applied the

deficient performance and actual prejudice analysis required under *Strickland.* 466 U.S. at 694 (requiring a "reasonable probability that, but for counsel's unprofessional error, the result of the proceeding would have been different"). Under AEDPA, this Court must ask if the state court decision was "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." *Moore v. Cockrell,* 313 F.3d 880, 881 (5th Cir. 2002); 28 U.S.C. § 2254(d). Having the reviewed the record, and in light of the state court determinations and the AEDPA standards for review, this Court cannot find that petitioner met the high burden of proof set by *Strickland* as to actual prejudice or that he meets the even higher burden of proof set by AEDPA.

Petitioner further argues that, even if the state court determined that petitioner was not prejudiced by counsel's separate acts of deficient performance, the state habeas court should have considered the cumulative prejudicial effect of counsel's errors. The Fifth Circuit Court of Appeals has in some cases applied the cumulative error doctrine to claims of ineffective assistance of counsel. *See White v. Thaler,* 610 F.3d 890, 912 (5th Cir. 2010) (discussing, in the alternative, "the combined prejudicial effect" of counsel's errors); *Richards v. Quarterman,* 566 F.3d 553, 564 (5th Cir. 2009) ("We will address each aspect of [counsel's] performance the district court found deficient before considering whether [petitioner] was cumulatively prejudiced thereby."). The doctrine, however, has not gone unquestioned. *See*

*Moore v. Johnson*, 194 F.3d 586, 619 (5th Cir. 1999) (stating, in a pre-AEDPA context, that the court was unable to find that the cumulative effect of all deficiencies at the guilt phase was sufficient to render the guilty verdict unreliable); *Miller v. Johnson*, 200 F.3d 274, 285–86 n. 6 (5th Cir. 2000) (holding that petitioner had not shown cumulative error with respect to his ineffective assistance of counsel claim but not specifically addressing whether cumulative error applied after AEDPA). The applicability of the doctrine post-AEDPA was questioned in *Zimmerman v. Cockrell*, 69 F. App'x 658, 2003 WL 21356018 (5th Cir. 2003):

> We have reservations with respect to the applicability of cumulative error in the context of ineffective assistance after the enactment of AEDPA. This is because in order for there to be constitutional error in the form of ineffective assistance of counsel, the petitioner must fulfill both prongs of *Strickland*. If either prong is not satisfied, then the petitioner has not shown constitutional error, much less unreasonable constitutional error. On the other hand, if a petitioner demonstrates both prongs of *Strickland* and an objectively unreasonable determination in state court, relief is available. There is no need to cumulate. Nonetheless, in an abundance of caution, we have examined [petitioner's] claim of ineffective assistance under the rubric of cumulative error and reject [the] claim. Accordingly, the above-claimed individual errors do not merit relief, nor do we conclude that the cumulative effect of the alleged errors fatally infected the fundamental fairness of the trial.

*Id*. at *12 (footnote omitted). However, in a recent unpublished decision, the Fifth Circuit declined to apply the cumulative error doctrine because no multiple instances of deficient performance were shown. *Dodson v. Stephens*, 611 F. App'x 168, 178–79 (5th Cir. 2015). Regardless, it does not appear the Supreme Court itself has clearly held that the cumulative error doctrine applies post-AEDPA in context of ineffective assistance of counsel claims. Consequently, petitioner cannot show that any failure by the state court to apply the

cumulative error doctrine, or to find actual prejudice, was contrary to, or involved an unreasonable application of, *Strickland* or other Supreme Court precedent.

The state court on collateral review denied petitioner's claim for ineffective assistance of counsel. Petitioner fails to show that the state court's determination was contrary to, or involved an unreasonable application of, *Strickland* or was an unreasonable determination of the facts based on the evidence in the record. Respondent is entitled to summary judgment dismissal of this claim.

## VI.  CERTIFICATE OF APPEALABILITY

The question of actual prejudice that may have been caused by counsel's deficient performance during the punishment hearing is a close and difficult one, and this Court acknowledges that a different jurist might reasonably reach a different determination as to whether petitioner was prejudiced by counsel's errors.  The Court will therefore grant petitioner a certificate of appealability as to whether the state court was objectively unreasonable in determining that petitioner was not prejudiced by trial counsel's deficient performance during the punishment phase of his trial.

## VII.  CONCLUSION

Respondent's motion for summary judgment (Docket Entry No. 11) is **GRANTED** and this lawsuit is **DISMISSED WITH PREJUDICE**.  Any and all pending motions are **DENIED AS MOOT**.

A certificate of appealability is **GRANTED** as to the issue of whether the state court was objectively unreasonable in determining that petitioner was not prejudiced by trial counsel's deficient performance during the punishment phase of his trial.

**SIGNED** at Houston, Texas on the 31st day of March, 2016.


_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE